## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PROVITA EUROTECH, LTD | : | Case No. 4:15-CV-01638 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| KEVIN MARMOR and | : | |
| SILOA ANIMAL HEALTH, LLC | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM
March 3, 2016

Pending before this Court is a Motion for a Preliminary Injunction[1] filed by Plaintiff Provita Eurotech, LTD (hereinafter "Provita") on December 2, 2015. Provita seeks to enjoin Defendants Kevin Marmor and Siloa Animal Health, LLC (hereinafter "Defendants"), for a period of one year from the date of this Court's Order, from the following actions: disclosing or making use of any confidential information or trade secrets belonging to Provita, soliciting business from customers or clients of Provita, soliciting any Provita employee for employment elsewhere, conducting business activities that are the same or similar to those of Provita, or in any way interfering with Provita's existing or prospective business relations.

---

[1] ECF No. 17.

The Court conducted a preliminary injunction hearing on the matter on January 11, 2016, after which the parties were ordered to submit briefs to the Court regarding jurisdiction and choice-of-law by February 1, 2016. On Defendants' motion, the parties were subsequently given until February 10, 2016 to submit their briefs. On that date, Defendants docketed a letter with the Court indicating that the parties had reached an agreement on the issues, which precluded the need for the briefs. This matter is now ripe for the Court's consideration.  For the following reasons, Provita's Motion for Preliminary Injunction is granted.

## I. BACKGROUND

This case arises from an employment relationship between Provita and Defendant Kevin Marmor. Provita, a Northern Ireland company engaged in the business of marketing and selling animal health products, hired Mr. Marmor as a regional manager to expand sales in the United States. Provita and Mr. Marmor entered into a September 20, 2010 employment contract (hereinafter the "Employment Agreement"), in which Mr. Marmor agreed to accept employment with Provita under the Employment Agreement's terms and conditions.

Mr. Marmor's employment commenced on November 1, 2010. Mr. Marmor excelled at the company, quickly reaching "master level," and became national sales manager in 2011. In his various positions, Mr. Marmor traveled throughout

the United States and sold Provita products on a national scale. Mr. Marmor was tasked with the responsibility of managing the entire network in the United States.

In July 2012, Michael Kerr, owner of Provita, formed Provita Animal Health, LLC (hereinafter "PAH"), a Florida limited liability company, to facilitate importing of Provita's products for sale in the United States and to facilitate payment for Provita's employees working in the United States. Accordingly, all Provita employees in the United States began working under PAH. As an employee in the United States, Mr. Marmor completed an I-9 and a W-4 for PAH and subsequently began receiving paystubs and W-2s from PAH.

Mr. Marmor was terminated from his employment on February 5, 2015. A month later, on March 6, 2015, Mr. Marmor formed Siloa Animal Health, LLC (hereinafter "Siloa"), a Pennsylvania limited liability company engaged in the business of marketing and selling animal health products.

On August 24, 2015, Provita filed a nine-count complaint against Defendants alleging, among other things, that Mr. Marmor breached the Employment Agreement.[2] Provita alleged that Mr. Marmor violated several clauses

---

[2] Provita alleges the following Counts in its complaint: Count I: Breach of contract against Defendant Marmor; Count II: Violations of the Uniform Trade Secrets Act ("UTSA"), 12 P.A. C.D.A. § 5301 *et seq.*; Count III: Tortious interference with existing business relations against Defendant Marmor; Count IV: Tortious interference with prospective business relations against Defendant Marmor; Count V: Commercial disparagement against Defendant Marmor; Count VI: Violation of the UTSA against Defendant Siloa Animal Health; Count VII: Tortious interference with existing contractual relations against Defendant Siloa Animal Health; Count VIII: Tortious interference with existing business relations against Defendant Siloa Animal Health; Count IX: Tortious interference with prospective business relations against Defendant Siloa Animal Health. ECF No. 1. This Memorandum analyzes the merits of Count I, the breach of contract claim. Counts II through IX involve the same facts and transactions as Count I, so that establishing a violation of Count I is sufficient to imply success on Counts II through IX.

in the Employment Agreement, including a non-disclosure clause and a non-competition clause, by forming Siloa.

Specifically, the Employment Agreement prohibited Mr. Marmor from disclosing, communicating, or using any confidential information for a period of one year after his termination from employment for any reason. The Employment Agreement further contained non-competition provisions prohibiting Mr. Marmor from directly or indirectly soliciting business from customers or clients of Provita for one year after termination from employment. It also prohibited Mr. Marmor from engaging in any enterprise conducting business activities that are the same or similar to Provita within the United States. The Employment Agreement also entitled Provita to enjoin or restrain Marmor from violation of the terms and provided for damages Provita sustained from breach of the agreement. Lastly, the Employment Agreement provided indemnification for Provita for reasonable attorney's fees and out-of-pocket costs related to a breach of the agreement.

Accordingly, Provita has filed the instant motion for preliminary injunction to enjoin Marmor from continuing to violate the Employment Agreement.

## II. JURISDICTION AND VENUE OF THE COURT

As noted above, Provita is a company organized under the laws of Northern Ireland. Mr. Marmor is a citizen of the United States who resides in Bloomsburg, Pennsylvania. Defendant Siloa is a limited liability company organized under the

laws of Pennsylvania with a principal place of business in Bloomsburg, Pennsylvania. In its complaint, Provita alleges that the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

The Employment Agreement at issue, however, provides that the parties will "submit to jurisdiction in Northern Ireland for adjudication of any disputes and/or claims between the parties under [the] Agreement… [and that] the parties hereby agree that the courts of Northern Ireland shall have exclusive jurisdiction over any disputes between the parties relative to this agreement."[3] Provita waives the contract choice of forum provision and argues that this Court has jurisdiction for the following reasons: the residence of both Defendants in the Middle District, the nature of the relief requested for purposes of the preliminary injunction, the number of witnesses residing in the United States, and the fact that Defendants do not have a substantial relationship with Northern Ireland. Provita also argues that the underlying cause of action includes a count pursuant to the UTSA, which rises under the laws of Pennsylvania, a count that could not be effectively or easily pursued in the courts of Northern Ireland. After initially arguing against the jurisdiction of this Court to entertain this matter, Defendants now concede that jurisdiction in this Court is, in fact, appropriate.[4]

---

[3] ECF No. 1-2 at ¶ S.
[4] See ECF No. 42 (letter filed by Defendants' counsel indicating that Mr. Marmor "is willing to agree to have the Court decide the matter based on Pennsylvania Law" and that they are "withdrawing any challenge to the Court's jurisdiction."

The Supreme Court of the United States has held that a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable.[5]

The circumstances of this case support Provita's position that this Court has diversity jurisdiction under 28 U.S.C. § 1332 and that the venue is proper.

Litigation in the courts of Northern Ireland would likely be so seriously inconvenient as to be unreasonable because both Defendants are domiciled in Pennsylvania, Mr. Marmor resides in Pennsylvania, the cause of action arose in Pennsylvania, the claim under the UTSA arises under the laws of Pennsylvania, and the majority of the witnesses likely to be deposed and called to testify are located in the United States.

---

[5] *Coastal Steel Corp. v. Tilhman Wheelabrator Ltd.*, 709 F.2d 190 (3d Cir. 1983)(*citing The Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10–11 (1972)), *overruled on other grounds by Lauro Lines v. Chasser,* 490 U.S. 495 (1989).

## III. CHOICE-OF-LAW

A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state.[6] Accordingly, the Court will apply Pennsylvania state law. Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them.[7]  Pennsylvania courts have adopted section 187 of the Restatement (Second) Conflict of Laws which provides that:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue....[8]

---

[6] *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994), citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 497 (1941); *American Air Filter Co. v. McNichol,* 527 F.2d 1297, 1299 n. 4 (3d Cir.1975).
[7] *Smith v. Commonwealth Nat. Bank,* 557 A.2d 775, 777 (Pa. Super. Ct. 1989), *appeal denied,* 569 A.2d 1369 (Pa. 1990).
[8] *See e.g., Schifano v. Schifano,* 471 A.2d 839, 843 n. 5 (Pa. Super. 1984) (citing with approval the Restatement, Second, Conflict of Laws).

In the instant case, the Employment Agreement's forum selection clause has a choice-of-law provision stating that "[i]t is intended that this Agreement be valid and enforceable under the laws of Northern Ireland, and that the laws of Northern Ireland shall govern the agreement's interpretation."[9] Provita, however, waives the choice of law provision and contends that Pennsylvania law be applied to this case. Defendants now concede that Pennsylvania law should be applied to this matter.

While the parties have a substantial connection to Northern Ireland, Northern Ireland does not have a substantial relationship to the transaction at issue. Mr. Marmor is domiciled and Siloa is incorporated in Pennsylvania. The cause of action occurred in Pennsylvania. Furthermore, the majority of Mr. Marmor's activities under the Employment Agreement have taken place in the United States. Mr. Marmor has resided in Pennsylvania for over eight years, during the entire time he was subject to the terms of the Employment Agreement. Lastly, this Court has an interest in hearing the cause of action under the UTSA, a cause of action that would be unavailable to Provita if this case were litigated under the laws of Northern Ireland.

## IV. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65, which governs the granting of preliminary injunctions, provides in pertinent part:

---

[9] ECF No. 1-2 at ¶ T.

**(a) Preliminary Injunction.**

**(1)** *Notice.* The court may issue a preliminary injunction only on notice to the adverse party.

**(2)** *Consolidating the Hearing with the Trial on the Merits.* Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing. Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. But the court must preserve any party's right to a jury trial
. . .

**(c) Security.** The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

It is well-settled that "[a] preliminary injunction is an extraordinary remedy never awarded as of right."[10] A party seeking a preliminary injunction must establish four factors: (1) a reasonable probability of success on the merits of their argument; (2) irreparable harm to the movant in the absence of relief; (3) granting the preliminary injunction will not result in greater harm to the nonmoving party; and (4) the public interest favors granting the injunction.[11] "It is well established that 'a preliminary injunction is customarily granted on the basis of procedures that

---

[10] *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008).
[11] *See American Exp. Travel Related Services, Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012).

are less formal and evidence that is less complete than in a trial or on the

merits.'"[12]

## V. DISCUSSION

## A. Reasonable probability of success on the merits of the argument

Provita alleges that Mr. Marmor's conduct subsequent to his employment

with Provita constitutes a breach of the non-disclosure and non-competition terms

of the Employment Agreement. The pertinent non-disclosure and non-competition

clauses of the Employment Agreement read as follows:

> D. Required Confidentiality. For so long as Employee shall remain
> employed by Employer and for a period of one year after termination
> of employment with Employer for any reason, Employee shall not
> disclose or communicate any "Confidential Information" of Employer
> to any person or entity other than Employer nor use said "Confidential
> Information" for any purpose or reason other than the benefit of
> Employer. For purposes of the preceding sentence, "Confidential
> Information" means (but is not limited to) any information regarding
> Employer's business methods, business policies, procedures,
> techniques, research or development projects or results, sales
> information of any kind, financial information of any kind, trade
> secrets or other knowledge possessed by Employer which is not
> generally known by individuals outside of the Employer (including
> Employer's employees, consultants, and advisors). Also,
> "Confidential Information" shall additionally include, but not be
> limited to, the follow (sic) information of Employer:
>> 1. Customer lists or other customer information;
>> 2. Sales strategy, tactics, or methods;
>> 3. Information pertaining to products or services under
>>    development;
>> 4. Internal company reports of any kind;
>> 5. All marketing strategies for site.[13]

---

[12] *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004) (*citing University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).

E. Noncompete Agreement. For so long as Employee shall remain employed by Employer and for a period of twelve (12) months after termination of employment with Employer for any reason (to be known as the "Noncompete Period"), Employee shall not directly or indirectly solicit business from customers of clients of Employer nor engage in (as an employee, principal, shareholder, partner, consultant or any other capacity) any enterprise conducting business activities that are the same or similar to those of Employer within the "the Noncompete Geographic Area" (defined below). Finally, during the Noncompete Period, Employee shall not directly or indirectly solicit any employee of Employer for employment elsewhere (i.e., employment with any person or entity other than Employer).

1. Employee's bar from soliciting business from "customers or clients" of Employer applies to all individuals or entities who were or are "customers or clients" of Employer at any time during the Noncompete Period.

2. The brief description of Employer's business activities contained in the recitals to this agreement shall not be considered an exclusive and exhaust(*sic*) list of the business activities of Employer.

3. The term "Noncompete Geographic Area," for purposes of this agreement, shall be defined as competing animal health companies within the United States of America.[14]

Under Pennsylvania law, "restrictive covenants are enforceable if they are incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and

---

[13] ECF No. 1-2 at ¶ D.
[14] ECF No. 1-2 at ¶ E.

geographic extent."[15] Pennsylvania enforces restrictive employment covenants "only so far as reasonably necessary for the protection of the employer"[16] as they are generally not favored, "and have been historically viewed as a trade restraint that prevents a former employee from earning a living."[17]

Provita argues that Mr. Marmor was an employee of Provita from November 1, 2010 through his termination on February 5, 2015 and that, consequently, Mr. Marmor was contractually bound by the Employment Agreement until February 5, 2016, twelve months after his date of termination. Mr. Marmor was, therefore, in breach of the non-competition clause when he formed Siloa on March 6, 2015, a company in the business of marketing and selling animal health products, including hoof care products and udder cream.[18] Mr. Marmor was also in breach when he sold hoof care products manufactured by Integrated Bio-Systems, LTD, a Canadian company, to customers in the United States, and when he contacted numerous customers of Provita and sold products to Provita customers.[19] Provita also asserts that Mr. Marmor violated the non-disclosure clause by using Provita's confidential customer information for soliciting Provita's customers and disclosing Provita's confidential pricing information.[20]

---

[15] *Hess v. Gebhard & Co. Inc.,* 808 A.2d 912, 917 (Pa. 2002) (citing *Sidco Paper Co. v. Aaron,* 351 A.2d 250 (Pa. 1976); *Morgan's Home Equip. Corp. v. Martucci,* 136 A.2d 838 (Pa. 1957).

[16] *Sidco,* 351 A.2d at 254.

[17] *Hess,* 808 A.2d at 917 (*citing Jacobson & Co. v. Int'l Env't Corp.,* 235 A.2d 612 (Pa. 1967)).

[18] ECF No. 18 at 8.

[19] Plaintiff's Exhibit 39 at ¶ 17-21.

[20] ECF No. 18 at 16-17.

Mr. Marmor, on the other hand, argues that he was not bound by the Employment Agreement because he ceased working for Provita in July 2012, when he became employed by Provita Animal Health, LLC ("PAH"), the Florida limited liability company. He also argues that even if he were bound by the Employment Agreement, the non-competition covenant is not reasonably limited in scope. Lastly, Mr. Marmor argues that the information that Provita seeks to protect is not actually trade secret material.

1. *The Employment Agreement was incident to an employment relationship between the parties.*

Mr. Marmor argues that while he may have initially been bound by the Employment Agreement, he was not bound by it in February 2015 because his employment with Provita had ended in July 2012 when he became employed by PAH. In support of his argument, he offers evidence that he completed a W-4 and I-9 for PAH and received W-2s from PAH as his employer. Additionally, Mr. Marmor's business cards indicated that he was employed by PAH. Mr. Marmor testified that he was told by Mr. Kerr in a joking manner that he had been "fired for a day" and then was rehired by PAH. He testified that Mr. Kerr made several comments indicating that he would provide him with a new employment agreement to sign, but that one was never produced.

Provita maintains that Mr. Marmor was an employee of Provita at all times between November 2010 and February 2015. Provita argues that payment of Mr. Marmor by PAH is not indicative of separate employment because Provita and PAH are "substantially interrelated and jointly operated"[21] and that one of the reasons PAH was established was to more easily manage tax issues for employees in the United States. Mr. Kerr testified that both companies are typically referred to as "Provita Animal Health," with no distinction as to locality of incorporation, and that Provita is not seen by customers or the public as "Provita Eurotech" or "Provita Animal Health, LLC."

Provita also argues that Mr. Marmor was subject to the direction and control of Provita at all times between November 2010 and February 2015. It claims that Mr. Marmor reported directly to Mr. Kerr and that he regularly apprised Mr. Kerr of his travel schedule. Provita also contends that Mr. Marmor submitted expense reports directly to the Northern Ireland office. Provita argues that Mr. Marmor had traveled to the Northern Ireland headquarters on two occasions, the last of which was in March 2014 (after PAH was incorporated) but has never visited the PAH office in Florida. Additionally, Provita contends that it shared confidential client information (delineated below) with Mr. Marmor through early 2015.

---

[21] ECF No. 18 at 7.

Neither party challenges the contention that Mr. Marmor was an employee of PAH. The issue, however, is whether PAH is directly related to or a subsidiary of Provita, or whether PAH is a completely separate and distinct company.

The issue of whether a company is a subsidiary or distinct from a foreign corporation is typically examined in service of process, tax, or piercing the corporate veil controversies. The analysis used in those cases, however, may provide some guidance in analyzing the employment relationship in this case. Pennsylvania courts have held that, despite the "separate formal corporate existence of each company[,] . . . if the record demonstrates that the subsidiary is the 'alter ego' of the parent to the extent that domination and control by the parent corporation renders the subsidiary a mere instrumentality of the parent . . ."[22]

Additionally, the "economic reality test" may also be helpful to analyze whether PAH is Provita's subsidiary. The "economic reality test," first elucidated by the United States Court of Appeals for the Ninth Circuit in *Donovan v. Sureway Cleaners*[23] and adopted by the United States Court of Appeals for the Third Circuit in *Donovan v. DialAmerica Marketing, Inc.,*[24] is a test used to determine whether

---

[22] *Barber v. Pittsburgh Corning Corp.*, 464 A.2d 323, 331 (Pa. Super. Ct. 1983) (*citing Botwinick v. Credit Exchange, Inc.*, 213 A.2d 349, 354).
[23] 656 F.2d 1368 (9th Cir. 1981).
[24] 757 F.2d 1376, 1382 (3d Cir. 1985).

an employment relationship exists for the purposes of actions filed pursuant to the

Fair Labor Standards Act.[25]

> Under the "economic reality test, a court must look at the following factors:
>
> 1) the degree of control exercised by the employer over the workers;
> 2) the worker's opportunity for profit or loss depending upon
> managerial skill; 3) the alleged worker's investment in equipment or
> material required for the tasks or the employment of helpers; 4)
> whether the service rendered requires special skill; 5) the degree of
> permanence of the working relationship; and 6) the extent to which
> the work is an integral part of the employer's business.[26]

"When applying the economic reality test, the federal courts have looked at the

totality of the circumstances and a single factor, by itself, is not necessarily

determinative."[27]

This Court is persuaded that PAH, while established separately from Provita,

operates as a mere subsidiary of Provita. Mr. Kerr testified that PAH was created

merely as a "legal necessity" to address the tax consequences of payment for

Provita's employees working in the United States and to facilitate the payment of

import dues in importing Provita product into the United States.[28] Mr. Kerr also

testified that no invoices were ever created in shipping Provita product between

Provita and PAH, and that there was no "written documentation, guarantee or

otherwise that obligated [PAH] to pay [Provita] in any formal way . . ."[29] In fact,

---

[25] *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991).
[26] *Id.*
[27] *Id.*
[28] ECF No. 38 at 31.
[29] *Id.* at 43.

Mr. Kerr testified that Provita has even provided funding for PAH since its formation and that no agreements have been made for PAH to repay Provita for its funding.[30] Accordingly, it appears that PAH was under the domination and control and merely an instrumentality of Provita.

This Court is further persuaded that Mr. Marmor was an employee of Provita through the time of his termination in February 2015. The parties stipulated that at all times between November 2010 and February 2015 Mr. Marmor reported directly to Mr. Kerr,[31] apprised Mr. Kerr of his schedule,[32] and submitted his expense reports to Stacey McAleer, a Provita employee in the Northern Ireland office.[33] The parties also stipulated that at all times, Provita provided Mr. Marmor with customer leads.[34] Mr. Marmor conceded repeatedly that no employment contract other than the Employment Agreement at issue was ever provided or signed by him or Mr. Kerr.

Additionally, Provita submitted multiple email correspondence to and from Mr. Marmor using the email address "kevin.marmor@provita.co.uk" after July 2012, and as late as February 3, 2015, two days before his termination.[35] Multiple price lists were also submitted by Provita that were allegedly given to customers by

---

[30] *Id.*
[31] Plaintiff's Exhibit 39 at ¶ 8.
[32] *Id.* at ¶ 11.
[33] *Id.* at ¶ 12.
[34] *Id.* at ¶ 13.
[35] Plaintiff's Exhibits 6, 13, 14, 15, 16.

Mr. Marmor.[36] Each of these customer lists directed customers to Provita's website at www.provita.co.uk. Lastly, Provita submitted an employment contract signed by Angela Eichorst, an employee hired by Mr. Marmor.[37] Ms. Eichorst (who resides in Truxton, New York according to the contract) appears to have signed a contract with Mr. Marmor where "Provita Animal Health" is said to have a Florida address (yet still lists the www.provita.co.uk website), but also appears to have signed a contract listing the employer as "Provita Eurotech Limited" with an address in Northern Ireland.[38]

These exhibits support Provita's position that Provita and PAH were in fact interrelated and jointly operated and that there was no intention for PAH to operate as a separate and distinct company. Provita, in its closing argument, adroitly pointed out that had it been Provita's intention to fire Mr. Marmor in July 2012, Mr. Marmor would have been in breach of the Employment Agreement during the time he was employed by PAH. If PAH was not jointly operated and essentially the same company as Provita, Provita would have likely sought to enjoin Mr. Marmor's activities with PAH and would have certainly refrained from sharing customer lists and information with him.

---

[36] Plaintiff's Exhibits 9, 10, 11, 12.
[37] Plaintiff's Exhibit 35.
[38] *Id.* at 4. When confronted with this fact at the hearing, Mr. Marmor indicated that it must have been a typographical error.

2. _The non-competition covenant in the Employment Agreement is reasonably_
   _limited in scope._

As previously stated, to be enforceable, restrictive covenants must be reasonably limited in duration and geographic scope.[39] Courts have generally held that covenants between one and three years have been deemed reasonably limited in duration.[40] Defendants do not contest that the Employment Agreement is likely reasonably limited in duration in that it is limited to one year.

The determination of reasonableness of geographic scope will depend on a number of factors, including the scope of the area in which the employee has performed services and developed a customer base, as well as the geographic scope of the employer's business.[41] Defendants contest that the Employment Agreement is reasonably limited in geographic area because the "noncompete geographic area" is the entire United States. Provita argues that the nationwide geographic limitation is appropriate because Provita distributes products across the United States and abroad.

---

[39] _Hess v. Gebhard & Co. Inc.,_ 808 A.2d 912, 917 (Pa. 2002) (citing _Sidco Paper Co. v. Aaron,_ 351 A.2d 250 (Pa. 1976); _Morgan's Home Equip. Corp. v. Martucci,_ 136 A.2d 838 (Pa. 1957).

[40] _Bettinger v. Carl Berke Assoc._, Inc., 314 A.2d 296 (Pa. 1974); _Blair Design & Construction Co. v. Kalimon_, 530 A.2d 1357 (Pa. Super. Ct. 1987); _Records Center, Inc. v. Comprehensive Mgt., Inc._, 525 A.2d 433 (Pa. Super. 1987), _but see Gagliardi Bros., Inc. v. Caputo_, 538 F. Supp. 525 (E.D.Pa.1982) (held that while one-year restraints are usually reasonable, such a restraint was not reasonable under the facts before it). _See also John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164 (Pa. 1977)_ (upholding three-year restriction); _AMP Inc. v. Aksu_, 237 F. Supp. 601 (M.D.Pa.1964) (upholding two-year restriction); _Harry Blackwood, Inc. v. Caputo_, 434 A.2d 169 (Pa. Super. Ct. 1981) (upholding three-year restriction). _See also Boldt Machinery & Tools, Inc. v. Wallace_, 366 A.2d 902 (Pa. 1976) (in divided opinion, upholding five-year restriction).

[41] _See Victaulic Co. v. Tieman_, 499 F.3d 227, 237 (3d Cir. 2007); _see also Quaker Chemical Corp. v. Varga_, 509 F. Supp. 2d 469, 476 (E.D. Pa. 2007).

19

In *Victaulic Co. v. Tieman*,[42] the Third Circuit expressed that, "in this Information Age, a *per se* rule against broad geographic restrictions would seem hopelessly antiquated" in holding that broad geographic restrictions are reasonable when they are "roughly consonant with the scope of the employee's duties."[43] Nationwide noncompetition limitations have been upheld in cases where the employee's territorial scope was indeed nationwide.[44] "When, however, the covenant imposes restrictions broader than necessary to protect the employer, [the Supreme Court of Pennsylvania has] repeatedly held that a court of equity may grant enforcement limited to those portions of the restrictions that are reasonably necessary for the protection of the employer."[45]

Marmor argues that Provita has provided no evidence that it markets or sells its products in all 50 states. He contends that prohibiting him from working anywhere within the United States would be an undue hardship and would impair his ability to earn a living.

During the hearing, however, Mr. Kerr testified that while a Provita employee, Mr. Marmor's duties included maintaining and growing the business by

---

[42] 499 F.3d 227 (3d Cir. 2007).

[43] *Id.* at 237.

[44] See *Volunteer Firemen's Insurance Services, Inc. v. CIGNA Property and Cas. Insurance Agency,* 693 A.2d 1330, 1338 (Pa. Super. Ct. 1997)(a nationwide noncompetition limitation was upheld because the "territorial scope of the covenant was comparable to the market actually serviced during the course of the [parties'] relationship"); see also *Kramer v. Robec, Inc.,* 824 F. Supp. 508, 512 (E.D. Pa. 1992)(the court held that a nationwide bar on competition was reasonable because the case involved the computer market, which is world-wide, and the defendant distributed throughout the nation and overseas).

[45] *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 920 (Pa. 2002).

interacting with dairy farmers, dealers, and distributors throughout the "entire United States."[46] Mr. Kerr indicated that Mr. Marmor traveled "extensively" and was reimbursed for expenses for traveling throughout the country.[47] According to Mr. Kerr, Mr. Marmor had full responsibility over distributing Provita product to dealers and sub-dealers "throughout the United States."[48] Mr. Marmor testified that he went from Pennsylvania to the state of Washington selling Provita products.[49]

The testimony during the hearing supports Provita's position that a nationwide geographic restriction is consistent with the nationwide scope of Mr. Marmor's job duties during his employment with Provita.

3. *The restrictions imposed by the covenant are reasonably necessary for the protection of the employer*

Provita also argues that Mr. Marmor violated the employment agreement by virtue of his ownership and operation of Siloa, his solicitation of the customers of Provita, and by his sale of products to customers of Provita. Mr. Marmor argues in response that the information Provita wants protected[50] is not considered "trade

---

[46] ECF No. 37 at 27.
[47] *Id.*
[48] *Id.* at 29.
[49] *Id.* at 124.
[50] Section D of the employment agreement provides:

> D. Required Confidentiality.   . . . for a period of one year after termination of employment with the Employer for any reason, Employee shall not disclose or communicate any "Confidential Information" of Employer to any person or entity other than Employer nor use said "Confidential Information" for any purpose or reason other than the benefit of the Employer. For purposes of the preceding sentence, "Confidential Information" means (but is not limited to) any business policies, procedures, techniques, research or development projects or results, sales information of any kind, financial information of any kind, trade secrets or other knowledge possessed by Employer which is not generally known by individuals

secret material." He argues that Provita's customer lists are easily ascertainable by the public and widely known throughout the industry. He also argues that, while he did not disclose Provita's pricing information, Provita's pricing information was also "readily available to the public or competitors by contacting dealers."

A covenant must be reasonably necessary for the protection of the employer. To do this, a covenant must be tailored to protect legitimate interests.[51] "Generally, interests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills."[52] Courts have also enforced covenants where customers of an employer were solicited by the former employee in violation of the covenant.[53]

Pennsylvania has adopted the Restatement of Torts definition of a trade secret:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.[54]

---

outside of the Employer . . . Also, "Confidential Information" shall additionally include, but not be limited to, the follow (*sic*) information of Employer:
  1. Customer lists or other customer information;
  2. Sales strategy, tactics, or methods;
  3. Information pertaining to products or services under developments;
  4. Internal company reports of any kind;
  5. All marketing strategies for site.

[51] *Victaulic*, 499 F.3d at 235.
[52] *Hess*, 808 A.2d at 920.
[53] *John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164 (Pa. 1977).
[54] *Id.* (*citing* Restatement (First) of Torts § 757, cm b (1939)).

In *SI Handling Systems, Inc. v. Heisley,*[55]  the Third Circuit held that to establish a right to injunctive relief barring the disclosure of allegedly confidential information under Pennsylvania law, the moving party must demonstrate 1) that the information constitutes a trade secret; 2) that it is of value to the moving party and important in its business; 3) that by reason of discovery or ownership the moving party has a right to the use and enjoyment of the secret; and 4) that the secret was communicated to the non-moving party while employed in a position of trust and confidence under such circumstances as would render it inequitable and unjust for that party to disclose the information to others, or to make use of it himself, to the prejudice of the moving party.[56]

The *SI Handling Systems* court listed six factors to consider in determining whether the information is a trade secret: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.[57]

---

[55] 753 F.2d 1244, 1254 (3d Cir.1985).
[56] *Id.* at 1255.
[57] *Id.* (*citing* Restatement (First) of Torts § 757, cm b (1939)).

23

A business' customer list is clearly one of the enumerated examples of trade secrets in the Restatement of Torts' definition noted above. "Customer lists which are readily and easily generated from trade journals, telephone book listings, or other sources of information available generally," however, are not granted protection.[58] "The fact that individual pieces of the information claimed to be confidential are available to the general public does not defeat a claim of confidentiality if the value of the information stems from its compilation or collection in a single place or in a particular form which is of value."[59]

Mr. Marmor testified during the hearing that Provita's confidential price lists are "not very" confidential.[60] He explained that if any farmer was interested in purchasing the product, the farmer would simply need to ask a dealer for the price.[61] He admitted, however, that a customer would not have access to the wholesale price and that the wholesale would only be disclosed to a prospective dealer.[62] He also admitted that pricing information would depend on a variety of factors, including whether a customer purchased multiple containers of product, and this information is considered by the wholesaler in generating a price.[63] Mr. Kerr testified that, because Mr. Marmor was familiar with the pricing structure and

---

[58] *Mettler-Toledo, Inc. v. Acker*, 908 F. Supp. 240, 247 (M.D. Pa. 1995) (*Bell Fuel Corp. v. Cattolico*, 544 A.2d 450, 461 (Pa. Super. Ct. 1988).

[59] *Mettler-Toledo, Inc.*, 908 F. Supp. at 247 (citing *National Risk Management, Inc. v. Bramwell*, 819 F. Supp. 417, 432 (E.D. Pa. 1993)).

[60] ECF No. 38 at 155.

[61] *Id.*

[62] *Id.*

[63] ECF No. 38 at 180-81.

the distribution network, Mr. Marmor "was able to use his knowledge" and offer

similar products at a much lower price than Provita.[64]

Mr. Marmor also testified that customers can readily discover who is a

Provita customer simply by networking at trade shows. He further argued that

generating a customer list can be done by using the internet, networking, or simply

by visiting farms and connecting with individual dairy farmers.[65] He stated that he

created a customer list while he worked with PAH and that the customer list was

displayed on his bulletin board and was distributed to his representatives.[66]

The parties stipulated, however, that Mr. Marmor contacted no less than

eleven representatives of Provita customers after February 5, 2015.[67] Of those

eleven people, at least three, who had purchased product from Provita in 2014, did

not subsequently purchase product in 2015.[68] One of those entities, SMI, purchased

approximately $41,000 of Provita product in 2014 but purchased only $3,000 of

Provita product in 2015.[69]

The Court finds that the information Provita seeks to keep confidential falls

within the definition of a trade secret. Mr. Marmor testified that the wholesale

prices are not distributed to customers and that pricing is dependent on a variety of

---

[64] *Id.* at 47.
[65] *Id.*
[66] ECF No. 38 at 158-59.
[67] Plaintiff's Exhibit 39 at ¶ 17.
[68] ECF No. 38 at 48-49.
[69] *Id.*

factors. He also testified that he himself compiled the customer lists while working

for PAH and, therefore, the customer list was not easily created from an internet

search or a phone book. Mr. Marmor also testified that he was a "one man show"

and "did everything under the sun" while working for Provita, implying that he

single-handedly built Provita's United States customer base.[70] He did this,

however, as part of his employment responsibilities while receiving a salary from

Provita's subsidiary.

### B. <u>Irreparable harm to the movant in the absence of relief</u>

Next, Provita must prove that it will suffer irreparable injury in the absence

of a preliminary injunction. "The purpose sought to be achieved by the issuance of

a preliminary injunction is 'the avoidance of irreparable injury or gross injustice

until the legality of the challenged action can be determined.'"[71] "'It is not the

initial breach of the covenant which necessarily establishes the existence of

irreparable harm but rather the unbridled threat of the continuation of the

violation,' and incumbent disruption of the employer's customer

relationships.[72] Therefore, even where injury is small in "monetary terms,"

"disruption of established business relations which would result in incalculable

---

[70] ECF No. 38 at 123.
[71] *West Penn Specialty MSO, Inc. v. Nolan*, 737 A.2d 295, 299 (Pa. Super. Ct. 1999) (citing *All–Pak, Inc. v. Johnston*, 694 A.2d 347, 350 (Pa. Super. Ct. 1997)).
[72] *West Penn Specialty MSO, Inc.,* 737 A.2d at 299 (*citing John G. Bryant Co.*, 369 A.2d at 1167).

damage" is grounds for an injunction.[73] Protectable interests include the protection of trade secrets and customer goodwill.[74] A court may chose a more narrow restriction if it finds that a more targeted restriction will protect the employer's interests.[75] "A trade secret once lost is, of course, lost forever and therefore, such a loss 'cannot be measured in money damages.'"[76]

Provita argues that Marmor is utilizing confidential information obtained while he worked for Provita to directly solicit Provita's customers and is, therefore, purposefully interfering with Provita's business and customer relationships and will continue to do so if not enjoined by this Court. As described above, Mr. Kerr testified that at least three of the Provita customers that Mr. Marmor contacted after his termination either ceased buying Provita product or decreased their orders significantly. Mr. Kerr explained that Mr. Marmor has caused Provita substantial harm by his use of knowledge of Provita's pricing structure within the distribution network in order to sell his own products at lower prices, causing "confusion" among customers.[77] Mr. Marmor's actions have resulted in lost customers and lost revenue for Provita.[78]

---

[73] *Id.*  (*citing New Castle Orthopedic Assoc's v. Burns*, 392 A.2d 1383, 1386 (Pa. 1978)).

[74] *John G. Bryant Co.*, 369 A.2d at 1167.

[75] *Thermo-Guard, Inc. v. Cochran*, 596 A.2d 188 (Pa. Super. Ct. 1991), *see also Gordon Wahls Co. v. Linde*, 452 A.2d 4 (Pa. Super. Ct. 1982), *but see Blair Design & Construction Co., Inc.*, 530 A.2d 1357 (the court enforced a non-solicitation of customers restriction even with respect to customers who were not actually listed in the restrictive covenant at issue).

[76] *Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (*quoting FMC Corp. v. Taiwan Tainan Giant Indus. Co.,* 730 F.2d 61, 63 (2d Cir. 1984)).

[77] ECF No. 38 at 47.

[78] *Id.*

This Court agrees that Provita will continue to be irreparably harmed in the absence of this injunction. Mr. Marmor continues to directly compete against Provita, including at a trade show one week before the preliminary injunction hearing.[79]

## C. <u>Granting the preliminary injunction will not result in greater harm to the nonmoving party</u>

After determining that Provita would suffer irreparable injury in the absence of injunctive relief, this Court must then balance that injury with any harm that would be suffered by the Defendants if the preliminary injunction were to be entered.  Provita cites two cases in support of its argument that this Court should not consider the harm that would come to Mr. Marmor because he engaged in unlawful conduct.

Provita's cases, however, are inapt. Most distinguishable is *Peters v. Davis*,[80] a case in which the defendant violated restrictive covenants and zoning ordinances running with real property, not with a restrictive covenant on an employment contract. Provita's second case, *Merrill Lynch, Pierce, Fenner & Smith v. Napolitano*,[81] deals with a restrictive covenant in an employment contract like the instant case; it is also distinguished, however, because the restrictive

---

[79] *Id.* at 183.
[80] 231 A.2d 748, 751 (Pa. 1967).
[81] 85 F. Supp. 2d 491, 497-98 (E.D. Pa. 2000)

28

covenant was more limited than the covenant signed by Marmor. The defendant in *Merrill Lynch* was not enjoined from engaging in his trade altogether but only from soliciting *Merrill Lynch* clients. Mr. Marmor, however, is faced, not only with being enjoined from selling animal health products to former Provita clients, which is specified in one provision of the employment contract, but also with engaging in the selling of animal health products to anyone in the United States.

Nevertheless, this Court has found the non-compete clause reasonable in terms of time and geographic scope. While this Court recognizes that Mr. Marmor will suffer harm as a result of this injunction, it is not outweighed by the irreparable harm that Provita will continue to suffer absent a preliminary injunction.

### D. **The public interest favors granting the injunction**

The Court must consider whether granting the injunction would be contrary to public policy. Although there is a substantial public policy interest disfavoring labor preliminary injunctions, the remedy that the Court has fashioned here is narrowly tailored in both time as well as geographic scope. Moreover, the proprietary interests at stake in this case necessitate prompt judicial intervention in order to prevent irreparable harm.

**IV. CONCLUSION**

For the foregoing reasons, the Court will grant Provita's motion for

preliminary injunctive relief in its entirety.

An appropriate Order follows.

BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge